Argued and submitted February 11, 2015, affirmed on appeal and on cross-appeal September 21, 2016, petition for review allowed February 2, 2017
(360 Or 851)

In the Matter of the Marriage of

Claudia PORTER,
*Petitioner-Respondent
Cross-Appellant,*

*and*

Harry H. PORTER, III,
*Respondent-Appellant
Cross-Respondent.*

Multnomah County Circuit Court
111172446; A154656

381 P3d 873

Margaret H. Leek Leiberan argued the cause for appellant-cross-respondent. With her on the briefs was Jensen & Leiberan.

Helen C. Tompkins argued the cause and filed the briefs for respondent-cross-appellant.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

**DUNCAN, P. J.**

Husband appeals from a dissolution judgment that includes an award of spousal support and a division of property, asserting, among other contentions, that the trial court erred in concluding that the parties' "prenuptial agreement" was unenforceable because wife signed it involuntarily and because it was unconscionable.[1] Wife cross-appeals, contending that the trial court did not make a "just and proper" division of the marital assets. We write only to address husband's contention related to the enforceability of the agreement and conclude that the trial court correctly ruled that the agreement is not enforceable, because wife did not enter into it voluntarily, as required by ORS 108.725 and our case law interpreting that statute. Therefore, on husband's appeal, we affirm the trial court on that ground and do not address whether the agreement was unconscionable. On wife's cross-appeal we affirm without further discussion.

Husband has requested that we review the trial court's rulings *de novo*, but we conclude that this is not an extraordinary case, and we therefore do not exercise our discretion to review the case *de novo*. ORS 19.415(3)(b); ORAP 5.40(8)(c). Accordingly, we review the trial court's legal determinations for errors of law and its express and implicit factual findings for "any evidence in the record." *Morton and Morton*, 252 Or App 525, 527, 287 P3d 1227 (2012).

The facts relevant to our determination are largely undisputed. The parties were married for 10 years and have four minor children, ages four to nine. At the time of trial, wife was 42 and husband was 57. Husband is well to do, and the parties lived comfortably during the marriage. Wife grew up in Germany but she is fluent in English. She spent one year of high school in the United States as an exchange student, and has advanced degrees in English and linguistics, which she earned from German universities before moving to the United States in July 2001 to do research and to teach at Portland State University.

---

[1] The parties' agreement is labeled a "prenuptial" agreement, rather than a "premarital" agreement, as described in the Uniform Premarital Agreement Act (UPAA), ORS 108.700 to 108.740. Throughout this opinion, we refer to "the agreement," unless context requires otherwise.

The parties met in May 2002 and started dating that summer. Wife knew that husband had been married twice before. She was also aware that he did not have a financial need to work full time. The parties' versions of the facts differ slightly with respect to the circumstances surrounding the execution of the agreement. The trial court made an explicit finding that wife's version is credible. Wife testified that, in early December 2002, although the parties had not yet discussed marriage, husband mentioned that he was going to have his attorney prepare a prenuptial agreement, in the event that they should decide to get married. Wife testified that she told husband that she had never heard of a prenuptial agreement and that husband explained to her that it is something people sign when they want to get married, and

> "he just wanted to make sure that I wasn't in this relationship for his money. And I responded, 'If that's what it is about, I can sign it.'"

Wife testified that the parties had no further conversation about marriage until the afternoon of December 24, 2002. They were running errands together when husband suddenly pulled up to a bank and said, "We are going to the bank to sign the prenuptial agreement." At the bank, husband requested a notary and presented wife with three copies of a document to sign.[2] Wife testified that that was the

---

[2] Wife testified:

"Q. And how long did it take to get a Notary? Do you remember?

"A. She was available right away.

"Q. Okay. And then what happened next?

"A. He—we sat down with her close—somewhere close to the entrance. And she—well, no, he—he put out three copies of the prenuptial agreement. And—

"Q. Where did he put them?

"A. On the table in front of me.

"Q. Okay.

"A. And he told me to look over it and sign it and he pointed to where I had to sign it.

"Q. Okay. Did he tell you what it was?

"A. He said it was the prenuptial agreement.

"*****

"Q. So what did you do with the document?

first time she had seen the prenuptial agreement or the list of husband's assets attached to it as an exhibit. She testified that she did not read every word of the document because

"A. Well, I looked through it. And, you know, I didn't really read most of it, because most of it didn't make sense to me. And he pointed to where I should sign it. And I believed that it was what he said it was, just something to reassure him that I wasn't in this relationship for his money, so I signed it where he told me to sign it.

"Q. How much time did you spend with the document?

"A. Oh, a couple of minutes maybe. We spent a total of five minutes at the bank.

"Q. What was your understanding of the legal terms of the document? Did you understand it?

"A. Most of it I didn't, no.

"Q. Mm-hmm. Did you look at Page 1? Page 1 says, "The parties intend to be married." Did that jump out at you or did you not see that?

"A. Well, I saw it, but I felt, well, this is all hypothetical, because he said, 'It's in the event that we get married.' He hadn't proposed to me, so—

"Q. Did—did you ask him any questions about what was in the document?

"A. I just—you know, I remember saying that I don't really understand a lot of these terms, but it didn't seem to be an issue.

"Q. Mm-hmm.

"A. He, you know, just reminded me to sign it where I had to sign it.

"[By husband's counsel]. I'm sorry. Can you repeat what he said?

"[Wife]: I said that I remember saying that I didn't—a lot of these terms didn't make sense to me. But he continued to say it—you know, it was okay, I shouldn't worry about it, and, 'Sign right here.'

"\* \* \* \* \*

"Q. [By wife's counsel]. Did you flip through to find what's called 'Exhibit A, Separate Property of Harry H. Porter'?

"A. I glanced at it, yes.

"Q. Did you attach significance to it?

"A. It didn't make any sense to me.

"Q. Did you have an understanding at that time that you might be giving up rights to some of his property?

"A. No.

"Q. Did [husband] make any effort to explain this to you?

"A. No.

"Q. Do you have any legal training?

"A. No.

"Q. What was the total amount of time that you would say you spent inside the bank?

"A. Five minutes."

she did not understand most of it, especially the legal terminology, but that she did not remember asking husband to explain any of the terms. In addition, wife testified that she trusted husband and believed that the document was "rather insignificant," because only a notary (and not a lawyer) was present. Wife testified that she thought that, just as husband had told her, the agreement was only to reassure him that, if the parties ever married, she was not marrying him for his money. Wife testified that husband pointed to the places in the agreement where she needed to sign the agreement, but that she did not feel forced. The parties spent about five minutes at the bank.

Wife testified that she did not understand that the agreement provided that, in the event of divorce, she would not be entitled to spousal support or to any portion of husband's property. Wife testified that, had she understood the agreement, she would not have signed it and would have consulted a lawyer. Earlier that day, at husband's suggestion, wife had made an appointment to see a lawyer with regard to another matter, but it did not occur to wife to have that lawyer review the agreement, either before or after she signed it.

After the parties signed the agreement, they went to husband's house, where he placed two original copies of the agreement in a file folder in his office. He mailed the third copy to his attorney. The parties became engaged that night. Wife moved into husband's home in early March 2003, and the parties were married on April 19, 2003.

Wife filed the petition for dissolution in November 2011. She simultaneously sought a declaration that the agreement was unenforceable. The agreement is a 12-page single-spaced document that was prepared by husband's attorney. It includes a list of each party's assets, as well as recitals that each party has been fully informed of the nature of the agreement and has knowingly entered into the agreement.[3] Substantively, the agreement provides that

---

[3] The recitals stated:

"A. The parties intend to be married and desire to enter into this Prenuptial Agreement for the purpose of defining the respective rights which each shall have in the property and the estate of the other, both during the

all of the property and income of each party owned at the time of the marriage and acquired in the sole name of either party "shall remain the separate property of each of them." It further provides that, upon divorce or death, each party released and relinquished "all claims to and rights in the Separate Property" of the other, and that "[n]either party shall make any claim for alimony or spousal support from the other party." The agreement states that

> "[t]he parties acknowledge they have had ample opportunity to consult with independent legal counsel regarding the effects of this Agreement, the rights and privileges waived hereunder, the rights and privileges granted hereunder, the binding effect of the present and future consequences hereof, and all other matters pertaining to this

marriage and after its termination by the death of one of them, or by dissolution, annulment, or legal separation of the marriage.

"\* \* \* \* \*

"C. Each party is fully informed of the nature and extent of the rights being determined, modified or released by this Agreement. Each party has been had [sic] the opportunity to be advised by independent legal counsel as to the legal effect of this Agreement and the waivers contained herein. The parties recognize that, under existing Oregon court decisions and the provisions of ORS 108.700, they may enter into an agreement prior to their marriage concerning the disposition of their property in the event of the dissolution of their marriage and that the agreement will be enforced unless, with respect to support or alimony, enforcement would deprive a spouse of support which he or she cannot otherwise secure.

"D. Each party acknowledges that he or she has not only read and fully comprehended this Agreement and all of its terms, but also acknowledges that: (a) he or she has full and complete knowledge of the rights waived, released, or relinquished by this writing; (b) each party further acknowledges that he or she understands that, in the absence of this Agreement, the surviving spouse (in the event of the death of one spouse) may possess a number of rights in the property, assets and estate of the deceased spouse, these rights varying from state to state; (c) each party further acknowledges that he or she specifically understands that, in the absence of the Agreement, spouses may be entitled to alimony, spousal support and maintenance payments, both temporary and permanent, in the event of divorce, separation or dissolution of marriage; (d) each party specifically acknowledges that these statements of specific understanding do not purport to be exclusive of the knowledge and disclosure existing hereunder, but merely serve as particular examples; (e) each party acknowledges that he or she understands that by this Agreement he and she are giving up substantial legal rights of the property of the other in return for the right to keep separate and control his or her own property.

"E. Each party specifically acknowledges that he and she enters into the marriage relation in reliance upon the validity of this Agreement, and would not enter into the marriage relation in the absence of this Agreement."

Agreement. The parties hereby acknowledge their complete understanding of such legal effects of this Agreement."

After a hearing, the trial court ruled that the agreement was unenforceable, both because it had not been entered into voluntarily and because it was unconscionable. The court then tried the dissolution matter without regard to the agreement and awarded wife spousal support as well as personal property and an equalizing award of $612,047.

The parties raise a number of assignments of error on appeal and cross-appeal. Husband challenges the trial court's conclusion that the agreement is unenforceable and also assigns error to the trial court's award of spousal support and to the property division. Wife seeks to uphold the trial court's determination that the agreement is unenforceable and, on cross-appeal, seeks a larger equalizing award for the division of property. We write only to address and reject husband's contention on appeal that the trial court erred in determining that the agreement was unenforceable because it was not entered into voluntarily.

The parties' agreement was subject to the provisions of the Uniform Premarital Agreement Act (UPAA), ORS 108.700 to 108.740. Under ORS 108.710, parties may enter into a premarital agreement with respect to most matters to be resolved at dissolution, including the division of property and the award of spousal support. A premarital agreement becomes effective upon marriage. ORS 108.715. When a party challenges the enforceability of a premarital agreement, the court is required to evaluate it under ORS 108.725, which provides, in relevant part:

"(1)   A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:

"(a)   That party did not execute the agreement voluntarily; or

"(b)   The agreement was unconscionable when it was executed and, before execution of the agreement, that party:

"(A)   Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

"(B)   Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

"(C)   Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party."

The trial court's conclusion that the parties' agreement is unenforceable was based primarily on the court's findings concerning the circumstances of its execution, which led the court to conclude that wife had not signed the agreement voluntarily and that it was unconscionable. The court further found that the parties had not had a "meeting of the minds." *See Bennett v. Farmers Ins. Co.*, 332 Or 138, 148, 26 P3d 785 (2001) ("Mutual assent, or what historically was considered as the 'meeting of the minds' requirement, may be expressed in words or inferred from the actions of the parties."); *Palmer v. Wheeler*, 258 Or 41, 49, 481 P2d 68 (1971) ("whether there was a sufficient meeting of the minds upon all terms" is a question of fact).[4]

In support of its conclusions, the trial court found that the parties had not discussed the terms of the agreement in advance; that wife had not seen a copy of the agreement before husband asked her to sign it and had not had an opportunity to review its terms or the list of husband's assets in advance; that wife did not have a chance to negotiate the terms of the agreement; that wife did not have time to fully read or understand the agreement; and that, despite the recitals of the agreement, wife had not been informed of and did not fully understand the nature of the agreement or the rights that were being determined. The court was particularly troubled that husband, who had had experience with premarital agreements, had not recommended that wife have an attorney review the agreement. The court found that husband had made an intentional effort to create circumstances in which wife would sign the agreement

---

[4] In *State v. Heisser*, 350 Or 12, 24, 249 P3d 113 (2011), the Supreme Court described the "meeting of the minds" as a "much abused metaphor" that is, in fact, simply the requirement that there be mutual assent to the terms of an agreement.

without sufficient time to review it or to have it reviewed by an attorney.

On appeal, husband assigns error to the trial court's ruling that the agreement is not enforceable, contending that the court erroneously concluded that wife did not sign it voluntarily and that it was unconscionable. Wife responds that the trial court's findings in support of its conclusions are supported by the evidence. Because we agree with wife that the evidence supports the trial court's conclusion that wife did not execute the agreement "voluntarily," as that term is used in ORS 108.725, we agree with the trial court's conclusion that the agreement was unenforceable.[5]

As husband correctly contends, under ORS 108.725, the party seeking a determination that a premarital agreement is not enforceable bears the burden of proving either that the party did not execute the agreement voluntarily or that the agreement was unconscionable when it was executed. ORS 108.725 ("premarital agreement is not enforceable if the party against whom enforcement is sought proves" involuntariness or unconscionability).

In *Rudder and Rudder*, 230 Or App 437, 455-56, 217 P3d 183, *rev den*, 347 Or 365 (2009), we addressed the meaning of "voluntarily," as used in ORS 108.725(1)(a). In the absence of a statutory definition for the term, we referred to dictionary definitions, concluding that the term "voluntarily" suggests "independent action, free from coercion and intimidation; an element of 'choice' is evident." 230 Or App at 449. We then cited a discussion by the California Supreme Court in its opinion in *In re Marriage of Bonds*, 24 Cal 4th 1, 5 P3d 815 (2000). That opinion is cited frequently

---

[5] In support of its conclusion that the circumstances surrounding the signing of the agreement rendered it unconscionable, the court found that the terms of the agreement were onerous, depriving wife of any spousal support or property and that, although husband had had the premarital agreement in his possession for weeks,

"he intentionally kept it from her. He intentionally went to [the bank] during a quick time and he intentionally did not give her a copy to review and sign, and intentionally didn't tell her she should have it reviewed by a lawyer."

In light of our conclusion that wife did not sign the agreement voluntarily, we do not reach the question whether the trial court's findings support the conclusion that the agreement was unconscionable under ORS 108.725.

for its discussion of the meaning of the term "voluntarily," as used in the UPAA. We quoted with approval the California Supreme Court's explanation that the Uniform Law Commission's official comments

> "demonstrate the commissioners' belief that a number of factors are relevant to the issue of voluntariness. In considering defenses proffered against enforcement of a premarital agreement, the court should consider whether the evidence indicates coercion or lack of knowledge * * *. Specifically, the cases cited in the comment * * * direct consideration of the impact upon the parties of such factors as the coercion that may arise from the proximity of execution of the agreement to the wedding, or from surprise in the presentation of the agreement; the presence or absence of independent counsel; inequality of bargaining power—in some cases indicated by the relative age and sophistication of the parties; whether there was full disclosure of assets; the parties' understanding of the rights being waived under the agreement or at least their awareness of the intent of the agreement."

230 Or App at 450 (quoting *Marriage of Bonds*, 24 Cal 4th at 17-18). The significance of that discussion for purposes of this case is that it suggests that involuntariness does not relate only to the immediate circumstances of the signing and whether they were coercive. In *Rudder*, we agreed with the California Supreme Court that the factors relevant to determining the element of voluntariness in the execution of a premarital agreement include the proximity of the document's presentation to the time of the wedding; any surprise in its presentation; the presence or absence of legal counsel; an inequality of bargaining power; disclosure of assets; an understanding of rights waived under the agreement; and, an awareness of the intent of the document. We also noted and agreed with the California court's observation that "[t]he commissioners also clearly anticipated that ordinary contract defenses, 'such as lack of capacity, fraud, duress, and undue influence,' would apply in assessing the voluntariness of an agreement." *Id.* (quoting *Marriage of Bonds*, 24 Cal 4th at 19).

In *Rudder*, we explicitly rejected an interpretation by the Iowa Supreme Court in *In re Marriage of Shanks*,

758 NW 2d 506, 517-18 (Iowa 2008), that involuntariness requires proof of duress or undue influence, as those terms are understood in contract law. *Rudder*, 230 Or App at 451-52. Rather, we concluded that the uniform law's comment showed that "the drafters of the UPAA intended a broader meaning of voluntariness to apply." *Id.* at 451.

We further said in *Rudder* that the California Supreme Court's reading of the UPAA was consistent with the view expressed in the legislative history of Oregon's enactment that the uniform law represented, essentially, a codification of common law. *Id.* at 452. Our analysis of Oregon's case law led to our conclusion in *Rudder* that, in determining the validity of a premarital agreement,

> "courts primarily considered the sophistication of the party against whom the agreement was being enforced, whether the party had a reasonable opportunity to review the agreement and to seek independent counsel, whether the party was aware of the purpose of the agreement, and, finally whether the party was aware of or should have been aware of the nature and extent of the property that would be affected. * * * It thus follows that the Oregon legislature, like California's, understood the term 'voluntarily' as used in ORS 108.725(1)(a) to imply a lack of coercion, intimidation, or undue pressure, as well as some modicum of knowledge of the terms of the agreement and the property affected. The timing of the agreement in relation to the wedding, and an adequate opportunity to consult with independent counsel, the relative sophistication of the parties, and a sufficient disclosure of assets are among the factors bearing on that question."

*Id.* at 455 (citations and footnotes omitted).

In concluding in *Rudder* that the wife had met her burden to show that she had not entered into the premarital agreement voluntarily, we cited the trial court's findings that the parties had first discussed the agreement in general terms a few weeks before their wedding; that the wife first saw the agreement on the day before the parties were scheduled to travel to Las Vegas for their wedding; that, although the wife had expressly requested the presence of her attorney at the signing, he was not present; that the husband urged the wife to sign the agreement because

the wedding plans were made; and that the entire meeting lasted no more than 30 minutes. In further support for our conclusion that the signing was involuntary, we cited evidence that the wife lacked sufficient knowledge of the extent of the property affected by the agreement; that the list of the husband's assets attached to the agreement was incomplete and did not include values; that the wife had limited knowledge of the husband's financial holdings; that the wife's experience in business affairs was limited; and that she was relatively unsophisticated in financial matters. We concluded on *de novo* review that "those circumstances created a sufficiently coercive environment so as to render wife's agreement involuntary." 230 Or App at 456.

Here, based on our application of the *Rudder* factors to the facts found by the trial court, we conclude that the record supports the trial court's conclusion that wife did not sign "voluntarily." It is true, as husband contends, that unlike in *Rudder*, husband presented the agreement to wife several months, rather than days, before the wedding (and indeed before the parties were even engaged), and wife testified that she did not feel pressured to sign it. But there are other factors that the trial court cited and that support its conclusion. Wife, although highly educated, was considerably less sophisticated than husband in matters of this nature, because English is not her first language and because of her lack of personal experience with legal matters relating to dissolution in the United States. The court found that wife was credible and accepted her testimony that, although the parties had spoken briefly and in general terms about husband's reason for wanting a prenuptial agreement, they never discussed the specific terms of the agreement. The court found, further, that wife did not understand the agreement's legal significance or its practical effect and did not have sufficient time at the signing to do so. The trial court's findings support its conclusion that wife did not sign the agreement voluntarily as required by ORS 108.725(1)(a), and as that term has been interpreted in *Rudder*. Wife was considerably disadvantaged by her lack of familiarity with divorce in the United States and with English legal terminology; husband took advantage of that circumstance by implying that the document was relatively

inconsequential and by presenting it to her suddenly, without sufficient time to review it or to have it reviewed by a lawyer.

It certainly is true, as husband points out, that a party has an independent obligation to protect his or her own interests and to read documents before signing them. Husband cites our opinion in *Knoll and Knoll*, 65 Or App 484, 488, 671 P2d 718 (1983), as setting forth a rule that a party's failure to read an agreement before signing it does not excuse a party's failure to understand the agreement. But *Knoll* is distinguishable. In that case, the wife, who had been presented with a premarital agreement nine months before the wedding, knew the purpose of the agreement, knew a great deal about the husband's financial affairs, and was repeatedly advised to seek independent counsel, yet failed even to read the agreement. Here, wife attempted to read the agreement but could not understand it; further, she testified that she signed the agreement without asking for an explanation because she trusted husband's implicit representations that the agreement was not significant and was only to reassure him that she would not marry him for his money.[6] The trial court believed wife. The trial court did not err in concluding that the premarital agreement was not enforceable because wife did not sign it voluntarily, as required by the UPAA, because of her failure to understand its purpose and consequences.

Affirmed on appeal and on cross-appeal.

---

[6] Wife testified that she "trusted that the document was what [husband] said it was, because I thought if he's going to marry me, he's going to tell me the truth."