Argued and submitted December 11, 2008, affirmed on appeal; on cross-appeal, judgment modified to award wife maintenance spousal support of $1,500 per month for 60 months and $1,000 per month indefinitely thereafter August 26, petition for review denied December 9, 2009 (347 Or 365)

In the Matter of the Marriage of

Samuel Arthur RUDDER,
aka Samuel A. Rudder,
*Petitioner-Appellant*
*Cross-Respondent,*

*and*

Hollie Ann RUDDER,
*Respondent-Respondent*
*Cross-Appellant.*

Coos County Circuit Court
06DM0549; A135992

217 P3d 183

George W. Kelly argued the cause and filed the briefs for appellant - cross-respondent.

Malcolm J. Corrigall argued the cause and filed the briefs for respondent - cross-appellant. With him on the briefs was Corrigall & McClintock, LLP.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

ARMSTRONG, J.

## ARMSTRONG, J.

Husband appeals a judgment of dissolution, contending that the trial court erred in failing to enforce the parties' premarital agreement relating to property and spousal support. Alternatively, he asserts that, even if the agreement was unenforceable, the court erred in treating as marital assets property acquired after the parties began cohabitating but before they were married. Wife cross-appeals, arguing that the court erred in awarding her maintenance spousal support of $1,000 per month for 60 months rather than indefinite support in a greater amount. We conclude that the trial court did not err in concluding that the premarital agreement is unenforceable. Next, although we agree with husband that the court erred in treating property acquired during the parties' cohabitation as marital assets subject to the presumption of equal contribution, we conclude that a just and proper division of the parties' property entitles wife to an equal division of those assets in any event. Accordingly, we affirm on appeal. On cross-appeal, we modify the judgment to award wife maintenance spousal support in the amount of $1,500 per month for 60 months and $1,000 per month indefinitely thereafter.

We begin with a brief overview of the facts and the proceeding below, adding a more detailed discussion as necessary in the context of each assignment of error. We review the facts *de novo*, deferring to the trial court's express and implied credibility findings. *Olson and Olson*, 218 Or App 1, 3, 178 P3d 272 (2008); ORS 19.415(3) (2007).[1]

Husband and wife began cohabitating in 1986[2] and were married on August 12, 1989. Both had been married previously; wife has one child from her previous marriage, and husband has two children from his previous marriage. They have no joint children. In 2006, husband petitioned for

---

[1] ORS 19.415 was recently amended by Senate Bill (SB) 262 (2009). Or Laws 2009, ch 231, §§ 2-3. The amendments apply to appeals in which the notice of appeal was filed on or after June 4, 2009. Because the notice of appeal in this case was filed before that date, we apply the 2007 version of ORS 19.415.

[2] Although wife testified that the parties began living together in January 1983, the trial court credited husband's testimony that they lived together only sporadically during that time and that the parties did not begin cohabitating full time until 1986. We see no reason to disturb the trial court's finding on that point.

dissolution of the marriage. At the time of the dissolution judgment, husband was 55 years old and wife was 49.

Husband, who is generally in good health, is a journeyman electrician and has worked for Bay Area Hospital since 1991. At the time of the dissolution, he was earning approximately $5,648 per month. Wife, after dropping out of high school, became a licensed cosmetologist. She purchased a two-chair beauty salon in 1984; she sold the business in 1994, but took it back and ran it again until January 2001, when she sold it for the final time. Wife continued to work part time in the salon after it was sold until approximately 2004. She suffers from debilitating migraines and, at the time of the dissolution, she reported zero income.

Before they were married, the parties entered into a premarital agreement, under which they each purported to waive any present or future interest in the separate real and personal property of the other and any claim to spousal support. The trial court ruled that the premarital agreement was unenforceable under ORS 108.725, *see* 230 Or App at 445, and divided the parties' property and awarded spousal support without regard to its terms. The court also concluded that property and any appreciation in property acquired during the period of the parties' cohabitation—from 1986 to 1989—was to be considered a marital asset, subject to the presumption of equal contribution under ORS 107.105(1)(f).

Applying that principle, the court then made the following rulings with respect to the property division: (1) The parties' residence (the Garden Lane property), which was acquired in 1988, and an adjacent vacant lot acquired in 1989 were marital assets to which the presumption of equal contribution had not been rebutted; therefore, the value of those properties was subject to an equal division. The parties disagreed as to the residence's value—wife contended that the fair market value was $242,460, while husband argued that it was $180,000. The parties agreed that the fair market value of the vacant lot was $34,907. The court ordered that both properties be sold and the net proceeds divided equally. (2) Real property that husband acquired in his earlier divorce

(the Michigan Street property) was not a marital asset; however, the appreciation on that property from the time the parties began cohabitating in 1986 until they separated in April 2006 ($154,338) was a marital asset, again subject to an even division. (3) Real property deeded to wife by her mother in 1996 for division among wife's siblings upon the mother's death (the North Bend property) was not marital property and not considered in the property division at all. (4) The portions of husband's Cascade Pension Trust Fund (Cascade Fund), National Electrical Benefit Fund (NEBF), and International Brotherhood of Electrical Workers Defined Benefit Plan (IBEW) that were earned between 1986 and April 2006 were marital assets to be divided equally, as was the appreciation on those accounts that accrued during the parties' cohabitation and marriage. The marital asset portions of those accounts were to be divided by a qualified domestic relations order (QDRO). (5) The balance of the parties' assets was divided roughly evenly, and wife was awarded an equalizing judgment of $72,903.25, representing "half of the difference between the value of the marital assets awarded to husband and the value of the marital assets awarded to wife." The court also awarded wife temporary spousal support of $1,000 per month for 60 months.

On appeal, husband contends that the court erred in failing to enforce the prenuptial agreement, under which "each party keeps the property in his or her own name, and there can be no spousal support." Failing that, husband argues that the court erred in determining that 1986—the date of cohabitation—rather than 1989—the date of the marriage—was the relevant date for determining whether an asset was a marital asset for the purpose of dividing the parties' property. Wife cross-appeals, contending that the court erred in failing to award her indefinite spousal support.

## I.   HUSBAND'S FIRST ASSIGNMENT OF ERROR: THE PREMARITAL AGREEMENT

The validity of the premarital agreement was the primary issue at trial. As noted, the parties began living together in 1986. Both parties were somewhat reluctant to remarry; however, in July 1989, they decided they would get

married the following month in Las Vegas. The parties executed a premarital agreement on August 10, 1989, the day before they were scheduled to fly to Las Vegas for their wedding on August 12.

The agreement specifies, in part:

"1. Each party does hereby release and waive all common-law and statutory rights of every kind and nature now existing or which hereafter may exist, which may be created in the separate property of the other party, which either party, as husband or wife, may have or could have arising during the marriage of the parties, as a result of their marriage or during the prior period of cohabitation between them, or upon the termination of the marriage of the parties prior to death."

As relevant here, the parties also purported to waive any claim for spousal support and "any and all rights or claims existing now or hereafter, with reference to their extended period of cohabitation prior to their intended marriage, * * * including, but not limited to, any claim for real property, personal property, personal services or otherwise[.]" Exhibit A of the agreement listed the major assets of the parties; the agreement states that the listing "is not intended by them to be complete, only to set forth[,] in writing, the parties' respective assets which both agree have significant value" and that, "by reason of their extended period of cohabitation," "they are each fully aware of these listed assets as well as all other assets and obligations of them each." The Garden Lane property and vacant lot, the Michigan Street property, the Cascade Fund, the NEBF, and a certificate of deposit were listed as husband's assets. Wife's assets were her beauty salon business, including the business's bank accounts, and a savings account that she held in the name of herself and her minor son. No values were listed for either party's assets.

Husband and wife presented conflicting testimony about the circumstances surrounding the preparation and execution of the premarital agreement. According to husband, the idea of being married and the idea of a premarital agreement came up at the same time, about a month before they were married. He testified that he had contacted Hedges, the attorney who had handled his earlier divorce, to

draft the agreement, and that, two weeks before the wedding, a draft of that agreement had been made available to wife. According to husband, wife never indicated that she needed more time to consult with an attorney about it, and she had a "very clear picture" of his business affairs and assets. Wife, on the other hand, testified that she had seen the agreement for the first time the day that she had signed it; that she had asked husband, when he announced that he was going to have Hedges prepare the agreement, to "make sure that Nick Nylander [wife's attorney] is there"; that Nylander had not been present when she arrived at Hedges' office to sign the agreement the day before they were to leave for their wedding; and that, when she asked husband where Nylander was and expressed doubts about signing the agreement without having him present, husband had responded, "Go ahead and sign it. [Hedges] can take care of this for both of us." Wife testified that she had then "read through it again, and I just knew I was giving up my house and giving everything up. And I just knew it wasn't right." When she said again, "I think I should call [Nylander]," she testified that husband "just kept saying, 'The wedding's on. You've told everyone you're getting married. We're leaving tomorrow morning. Go ahead and just sign it. The wedding is on.' " She further testified that husband had reassured her that she "was his whole world, and that he loved me forever."

The trial court made extensive findings relating to the premarital agreement, essentially adopting wife's version of events. Given that those findings were based on the trial court's assessment of the parties' respective credibility, we defer to them.[3] *Baxter and Baxter*, 139 Or App 32, 37, 911 P2d 343, *rev den*, 323 Or 483 (1996) ("In instances such as this, where an appellate court exercises *de novo* review in a situation where there is conflicting testimonial evidence, the common approach is to defer to the trial court's findings unless there is evidence in the record to suggest that those findings are incorrect."). Specifically, in its letter opinion, the court found:

---

[3] In that regard, the court was quite clear, stating, "The court finds wife's testimony to be more specific and credible as to the events in 1989 relating to the prenuptial agreement."

"1. This is the second marriage of both parties.

"2. The parties began to cohabitate in 1986 after having lived together on and off since 1983. The parties began to accumulate assets during their cohabitation, including a residence and vacant land on Garden Lane, appreciation of equity in the Michigan Street property, and growth in the value of husband's pension plans.

"3. The parties were somewhat reluctant to marry as each had experienced a difficult first marriage.

"4. The parties discussed marriage several weeks before they were married in Las Vegas on August 12, 1989.

"5. The parties discussed in general terms a prenuptial agreement two weeks before signing the original agreement. No specific terms were discussed by the parties.

"6. Husband contacted his attorney William Hedges to prepare a prenuptial agreement. Mr. Hedges is no longer living.

"7. Husband called wife on August 10, 1989[,] and told her to go to his attorney's office to review and sign the agreement.

"8. Wife had not seen the prenuptial agreement before August 10 and was not aware of the specific values of the properties claimed by husband as his separate property.

"9. Wife asked husband to arrange for her attorney Nick Nylander to be present to review the agreement. Wife had employed Nylander on other legal matters. Wife expected him to be at Hedge's office.

"10. Wife arrived at Hedges office. Nylander was not there. Wife was reluctant to sign on the spot. Husband assured her that Mr. Hedges would take care of them and that all was okay. Wife read and signed the agreement at the attorney's office. The meeting lasted not more tha[n] 30 minutes. Mr. Hedges gave a signed original to each party. Wife gave her original to husband for safekeeping.

"11. Airline tickets had previously been purchased for travel to Las Vegas. The parties were scheduled to leave the next day and, in fact, they flew to Las Vegas on August 11 and were married on August 12, 1989."[4]

---

[4] The trial court did not find credible wife's testimony that husband later destroyed the agreement in wife's presence to celebrate the fact that he had survived a serious car accident.

Given those circumstances, the court ruled that the agreement was invalid, stating:

"ORS 108.725(1)(b) required Husband to make a fair and reasonable disclosure of the property to Wife. Wife testified that she was not aware of the specifics of Husband's property affairs. The agreement does include a schedule of 'major assets' of Husband, but no values accompany the list of major assets. Furthermore, the schedule does not list the IBEW pension which was acquired in 1979. The court does not believe that the disclosure of assets on the schedule was sufficient for Wife to make an informed decision based upon her limited knowledge of the financial holdings of husband. A meaningful disclosure of assets is required. An opportunity to review with independent counsel is required. These are not present in this case.

"* * * The court is also concerned that the agreement effectively forfeits Wife's interest in any property she may have acquired during the term of the parties' domestic partnership. The court finds it unconscionable that Wife was asked to sign the agreement on short notice without a meaningful opportunity to consult with her attorney which resulted in forfeiture of potential property interests."

ORS 108.725, which governs the enforceability of the premarital agreement in this case, is part of the Oregon Uniform Premarital Agreement Act, ORS 108.700 to 108.740, enacted in 1987 (the Act). Or Laws 1987, ch 715. ORS 108.725 provides:

"(1) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:

"(a) That party did not execute the agreement voluntarily; *or*

"(b) The agreement was unconscionable when it was executed and, before execution of the agreement, that party:

"(A) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

"(B) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; *and*

"(C)   Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

"* * * * *

"(3)   An issue of whether a premarital agreement is unconscionable shall be decided by the court as a matter of law."

(Emphasis added.)

Husband argues that the case turns solely on whether the agreement fails as "unconscionable" under subsection (1)(b). As to that point, he argues that, under the plain text of the statute, an agreement may be invalidated only if it is unconscionable *and* all three of the following conditions are satisfied: (1) the party against whom it is being enforced was not provided reasonable disclosure of the other party's property; (2) the party did not waive the disclosure requirement; and (3) the party "did not have or reasonably could not have had an adequate knowledge of the property of the other party." In husband's view, none of those conditions was met in this case, and the trial court erred by instead applying obsolete case law to invalidate the agreement. Wife responds that, because the legislative history of the Act demonstrates that it "was enacted as an inclusive codification of the common law that existed at that time," the statute must be read in harmony with that case law. To do so, as we understand wife's argument, requires reading the conditions set forth in subparagraphs (A), (B), and (C) of subsection (1)(b) as a "listing [of] actions or omissions that tend to support a finding of unconscionability *and/or* involuntariness." (Emphasis added.)

Although it has been over 20 years since Oregon's adoption of the Act, Oregon courts have yet to construe the meaning of ORS 108.725. We do so now by first examining the statutory text and context; we also consider the legislative history underlying the statute where that history appears helpful in discerning the legislature's intent, even if there is no ambiguity in the statute's text. ORS 174.020(1)(b); *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

■    We first dispose of wife's argument that the disclosure conditions listed in subparagraphs (A), (B), and (C) of subsection (1)(b) are merely considerations supporting either "involuntariness" under subsection (1)(a) or "unconscionability" under subsection (1)(b). Frankly, that reading simply cannot be reconciled with the language and structure of the statute. First, the use of the disjunctive "or" in subsection (1) connotes two alternate ways of proving that an agreement is unenforceable—either if it was not voluntarily executed (paragraph (a)) *or* if it was unconscionable when executed (paragraph (b)). The use of the conjunctive "and" at the end of paragraph (b) then establishes *additional* conditions that must be satisfied before an "unconscionable" agreement will be invalidated. Those additional conditions—set forth in subparagraphs (A), (B), and (C)—are also stated in the conjunctive—that is, as husband argues, all three must be satisfied if an agreement is to be set aside under subsection (1)(b). In sum, the text of the statute clearly supports husband's reading of the statute.

The legislative history confirms that understanding. The Act was proposed by the Uniform State Laws Committee of the Oregon State Bar and followed essentially verbatim the Uniform Premarital Agreement Act (UPAA), drafted by the National Conference of Commissioners on Uniform State Laws in 1983. Testimony, House Committee on Judiciary, Subcommittee 3, HB 2295, Jan 28, 1987, Ex M (statement of Lawrence Young). In explaining section 6(a)(2) of the UPAA—the provision that eventually was codified in Oregon as ORS 108.725(1)(b)—at a hearing before a subcommittee of the House Judiciary Committee, Lawrence Young, former chair of the Oregon Uniform State Laws Committee, explained that unconscionability alone is insufficient to render an agreement unenforceable. In other words, under that provision, an agreement that is "merely" unconscionable— that is, one that is unconscionable, but the other factors of subsection (1)(b) have not been proved—will not be invalidated. Tape Recording, House Committee on Judiciary, Subcommittee 3, HB 2295, Jan 28, 1987, Tape 50, Side A (statement of Lawrence Young); *see also* Testimony, Senate Committee on Judiciary, HB 2295, May 27, 1987, Ex D (written testimony of Lawrence Young).

The history of the UPAA itself is also relevant in determining legislative intent. *See State of Oregon DCS v. Anderson*, 189 Or App 162, 169, 74 P3d 1149, *rev den*, 336 Or 92 (2003) (considering commentary to Uniform Interstate Family Support Act as legislative history of the relevant Oregon counterpart); *see also Kelly v. Olinger Travel Homes, Inc.*, 200 Or App 635, 644 n 5, 117 P3d 282 (2005), *rev den*, 340 Or 308 (2006) ("Although the Official Comments to the [Uniform Commercial Code (UCC)] lack the force of law, they are instructive, because the legislature took note of them at the time of adoption, they are consistent with the structure of the UCC, and the purpose of the Official Comments is to promote uniform construction of the UCC.").

The California Supreme Court analyzed the history of the UPAA in great detail in *In re Marriage of Bonds*, 24 Cal 4th 1, 5 P3d 815 (2000). The court describes a vigorous debate surrounding the adoption of the "unconscionability" prong of the statute. *Bonds*, 24 Cal 4th at 16, 5 P3d at 823-24 (citing National Conference of Commissioners on Uniform State Laws, Proceedings in Committee of the Whole, Uniform Premarital Agreement Act, July 23-26, 1983, pp 49-97 (Proceedings, Uniform Act)). Apparently, a minority of commissioners were of the view that "substantive fairness" should be the primary consideration in determining enforceability; the majority, however, placed more emphasis on certainty of enforcement. In the end, as the court explained,

> "eventually it was settled that the party against whom enforcement of a premarital agreement was sought only could raise the issue of unconscionability, that is, the substantive unfairness of an agreement, if he or she also could demonstrate lack of disclosure of assets, lack of waiver of disclosure, *and* lack of imputed knowledge of assets."

24 Cal 4th at 16, 5 P3d at 824 (citing Proceedings, Uniform Act, pp 52, 54, 75, 76, 80, 100, 101) (emphasis in original). *See also* Uniform Premarital Agreement Act, Prefatory Note, 9C ULA 36 (2001) (noting that the UPAA was designed to address problems caused by substantial uncertainty and nonuniformity among the states about the enforceability of premarital agreements).

■ Thus, to be unenforceable under ORS 108.725(1), wife must prove either that she did not enter into the agreement voluntarily *or* that it was unconscionable when it was executed *and,* before execution, she was not provided fair and reasonable financial disclosure, did not voluntarily waive that disclosure, *and* did not have, or reasonably could not have had, adequate knowledge of those matters. We begin with the question of voluntariness.[5]

■ The term "voluntarily" is not defined in the statute; accordingly we apply its ordinary meaning. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993) (words of common usage typically should be given their plain, natural, and ordinary meaning). The word "voluntarily" ordinarily means "in a voluntary manner : of one's own free will : SPONTANEOUSLY." *Webster's Third New Int'l Dictionary* 2564 (unabridged ed 2002). The definition of "voluntary," in turn, includes "proceeding from the will : produced in or by an act of choice," "acting of oneself : not constrained, impelled, or influenced by another." *Id.* Similarly, in law, "voluntarily" is understood to mean "[i]ntentionally; without coercion," and the meaning of "voluntary" includes "[u]nconstrained by interference; not impelled by outside influence." *Black's Law Dictionary* 1605 (8th ed 1999). Those definitions suggest independent action, free from coercion and intimidation; an element of "choice" is evident.

The history of the adoption of the UPAA again provides some additional guidance. Although the meaning of the term itself apparently did not generate much explicit discussion during the debate, *Bonds*, 24 Cal 4th at 17, 5 P3d at 824, the official comment relates that the conditions of enforceability—including voluntariness—"are comparable to concepts which are expressed in the statutory and decisional law of many jurisdictions," Uniform Premarital Agreement Act,

---

[5] We reject husband's suggestion that the question of "voluntariness" is not at issue in this case. In her trial memorandum, wife argued that the agreement "falls on both points." Her counsel also argued during closing arguments that the circumstances surrounding the execution of the agreement "put undue pressure on" wife. Further, although the basis for the trial court's decision is not entirely clear, some of the factors it relied on—for example, the opportunity to consult with independent counsel and the need for adequate disclosure—are, as discussed in detail below, relevant to the question whether an agreement was "voluntarily" executed.

§ 6 Comment, 9C ULA 49 (2001). As the California court explained in *Bonds*, the cases cited for that proposition

> "demonstrate the commissioners' belief that a number of factors are relevant to the issue of voluntariness. In considering defenses proffered against enforcement of a premarital agreement, the court should consider whether the evidence indicates coercion or lack of knowledge * * *. Specifically, the cases cited in the comment to [section 6 of the UPAA] direct consideration of the impact upon the parties of such factors as the coercion that may arise from the proximity of execution of the agreement to the wedding, or from surprise in the presentation of the agreement; the presence or absence of independent counsel or of an opportunity to consult independent counsel; inequality of bargaining power—in some cases indicated by the relative age and sophistication of the parties; whether there was full disclosure of assets; and the parties' understanding of the rights being waived under the agreement or at least their awareness of the intent of the agreement."

24 Cal 4th at 17-18, 5 P3d at 824-25 (footnote omitted). The commissioners also clearly anticipated that ordinary contract defenses, "such as lack of capacity, fraud, duress, and undue influence," would apply in assessing the voluntariness of an agreement. *Id.* at 19, 5 P3d at 825 (citing Proceedings, Uniform Act, p 131).

Iowa, by contrast, has taken a different tack. In *In re Marriage of Shanks*, 758 NW 2d 506, 517-18 (Iowa 2008), the Iowa Supreme Court held that factors such as the relative sophistication of the parties, the temporal proximity between the introduction of the agreement and the wedding date, the parties' opportunity for legal representation, the use of highly technical or confusing language or fine print, and the use of fraudulent or deceptive practices to get the disadvantaged party to agree—in other words, circumstances that the California Supreme Court identified as "coercive" and thus bearing on the voluntariness element—are properly considered in determining whether the agreement is "procedurally unconscionable." Involuntary execution is more narrowly understood in Iowa to require proof of duress or undue influence, as those terms are used in contract law. *Id.* at 512. Although the two principles are, to some extent, unavoidably

intertwined, we agree generally with the California court's reasoning.[6]

First, it bears noting that Iowa did not adopt the UPAA verbatim; among other modifications, it bifurcated the unconscionability and disclosure requirements. *Shanks*, 758 NW 2d at 514. Thus, under Iowa's version of the UPAA, courts have "somewhat greater latitude" to scrutinize the substantive fairness of an agreement under the unconscionability requirement than is the case under the UPAA. *Id.* As noted above, the UPAA drafters specifically rejected the approach taken by Iowa, in part because, in the drafters' view, the separate requirement that the contract be executed voluntarily "provided adequate protection to the weaker party." *Bonds*, 24 Cal 4th at 19, 5 P3d at 825 (citing Proceedings, Uniform Act, pp 71-73). It follows that the drafters of the UPAA intended a broader meaning of voluntariness to apply.

More importantly, that reading of the UPAA can be understood to be consistent with the intent of the Oregon legislature in enacting the Act. An examination of the history

---

[6] A decision from this court, *Coward and Coward*, 35 Or App 677, 582 P2d 834 (1978), is among the cases cited by the commissioners in the official comment to the UPAA and relied on by the California Supreme Court in its analysis. In *Coward*, although we did not speak explicitly in terms of the "voluntariness" of the agreement, we upheld the wife's execution of a premarital agreement where the wife was an experienced business person, had been advised to consult independent counsel before signing the agreement and had ample opportunity to do so, and was fully aware of the extent and value of her husband's property. 35 Or App at 680. The commissioners also cited several cases from other jurisdictions in the official comment that bear some similarity to *Coward. See, e.g., Hafner v. Hafner*, 295 NW 2d 567, 571-72 (Minn 1980) (upholding validity of premarital agreement where wife, a "reasonably intelligent and experienced individual," although not told of her rights in the absence of the agreement, was aware of and freely acceded to husband's desire to leave his property to his children); *Matter of Estate of Lebsock*, 618 P2d 683, 685 (Colo App 1980) (holding that a premarital agreement is unenforceable if a spouse establishes that it was entered into as a result of fraud or concealment; even where fraud or concealment is not established, the agreement may also be set aside if one spouse fails to make a fair disclosure of all relevant information or if it is determined to be unconscionable); *Lutgert v. Lutgert*, 338 So 2d 1111, 1115-16 (Fla App 1976) (circumstances surrounding the execution of the agreement— including that the husband sprang the agreement upon the wife and demanded its execution within 24 hours of the wedding, passage had been booked for a honeymoon cruise to Europe, invitations had been given and arrangements for the wedding had been made, and the husband had insisted on the agreement—together with the agreement's disproportionate terms, supported a presumption, as a matter of law, of undue influence and overreaching which bore adversely on the free exercise of the wife's will).

of the Act's passage in Oregon reveals that there was very little discussion of the specific meaning of the term "voluntarily." Representing the proponent of the bill before a House subcommittee, Young stated, "An agreement is not enforceable if it wasn't entered into voluntarily. Now, what voluntarily is is a good question. That's something for a judge to determine." *See* Tape Recording, House Committee on Judiciary, Subcommittee 3, HB 2295, Jan 28, 1987, Tape 50, Side A (statement of Lawrence Young). No discussion followed. The legislature understood, however, that the UPAA was essentially a codification of existing Oregon law.[7] Tape Recording, House Committee on Judiciary, HB 2295, April 24, 1987, Tape 438, Side A (statement of Rep Tom Hanlon). Young explained to the judiciary committees of the House and the Senate that the only real change from then-current Oregon law was a shift in the burden of proof; in other respects, it was codifying Oregon case law.[8]

---

[7] At the time, premarital agreements were recognized in Oregon statutory law. *Former* ORS 108.140 (1985), provided, in part:

"A man and a woman who are parties to an intended marriage may enter into a prenuptial agreement in writing concerning their respective personal property holdings, and the final disposition thereof, upon such terms and conditions as may be mutually determined. If such intended marriage is consummated, such prenuptial agreement shall be binding upon the parties thereto, their heirs, legal representatives and assigns."

It was repealed with the enactment of the UPAA. *See* Or Laws 1987, ch 715, § 10.

[8] In his written testimony, Young explained:

"Under section 6 of the [UPAA], the burden of proof will be on the party alleging that the agreement is not enforceable. Currently in Oregon, a premarital agreement is presumptively valid unless the provision for support of one party is disproportionate to the other's wealth. If such a case occurs, then there is a presumption that there was a designed concealment, and the burden shifts to the wealthy party to prove the agreement was executed with full knowledge and understanding. *Kosik v. George*, 253 Or 15, 452 P2d 560 (1969)."

Testimony, House Committee on Judiciary, Subcommittee 3, HB 2295, Jan 28, 1987, Ex M (written testimony of Lawrence Young); Testimony, Senate Committee on Judiciary, HB 2295, May 27, 1987, Ex D (same). *See also* Tape Recording, Senate Committee on Judiciary, HB 2295, May 27, 1987, Tape 163, Side A (statement of Lawrence Young).

Even that description of the purported change to existing law, however, was not entirely accurate. As we noted in *Day v. Vitus*, 102 Or App 97, 100 n 1, 792 P2d 1240, *rev den*, 310 Or 281 (1990) (citing *Merrill v. Merrill*, 275 Or 653, 552 P2d 249 (1976); *Knoll and Knoll*, 65 Or App 484, 671 P2d 718 (1983); and *Bauer v. Bauer*, 1 Or App 504, 464 P2d 710 (1970)), the statement in *Kosik* upon which it is based was *dicta* that Oregon courts declined to follow, even prior to enactment of the Oregon Act.

A review of the pre-Act case law is therefore in order. Premarital agreements have long been recognized as valid in Oregon. *See Moore v. Schermerhorn*, 210 Or 23, 308 P2d 180 (1957). As we noted in *Bauer v. Bauer*, 1 Or App 504, 507, 464 P2d 710 (1970) (citing *Taylor v. U. S. National Bank*, 248 Or 538, 436 P2d 256 (1968)), the validity of a premarital agreement "depends upon the circumstances of the particular case and all circumstances, including those attending its execution will be rigidly scrutinized." At the time of the enactment of the Act, it was also firmly established in Oregon law that the relationship between the parties to a premarital agreement is "fiduciary in character" if entered into in contemplation of marriage. *Kosik v. George*, 253 Or 15, 22, 452 P2d 560 (1969); *see also Merrill v. Merrill*, 275 Or 653, 552 P2d 249 (1976).

In *Kosik*, the court held that the husband breached his fiduciary obligation to the wife—thus rendering the agreement invalid—when he did not give the wife a reasonable opportunity to be informed of the consequences of the agreement. 253 Or at 23. There, the parties were married within about a week of their first date. The husband had his attorney prepare the agreement. The wife, who had a high school education and very limited business experience, was not advised to get her own attorney and had virtually no time to consider it before she signed it. They signed it on a Friday evening and were married the following Monday. *Id.* at 17-20.

As we explained more fully in *Bauer*, the fiduciary relationship between parties to a premarital agreement

"requires the utmost good faith and a full and frank disclosure of all circumstances materially bearing on the contemplated agreement, generally including full disclosure of assets[.]"

1 Or App at 507. *Bauer* illustrates how that principle is helpful in determining what the legislature intended, given its express intent to codify existing case law, by its use of the term "voluntarily" in ORS 108.725(1)(a). In *Bauer*, the wife did not know about the proposed agreement until the morning she and her intended husband were leaving for their wedding, when the husband took her to his attorney's office to

sign it. He did not tell her anything about his assets, nor did it appear that the wife had that knowledge. In light of those circumstances, we upheld the trial court's determination that the agreement was void, concluding that the wife was *"under the type of pressure and implied coercion* which is inconsistent with good faith on the part of her intended husband." 1 Or App at 508 (emphasis added).

Later cases echo that theme. In *Merrill*, 275 Or at 655, the parties began discussing a premarital agreement when they first considered marriage. Together they consulted the husband's son, who was an attorney, and both agreed that he would prepare the document. *Id*. The court found that the wife had been encouraged to seek her own legal counsel on two different occasions, and the wife herself testified that she had had ample opportunity to do so. The court also found that both parties were experienced in business dealings. *Id*. at 657. Thus, although the premarital agreement was executed just two days before the wedding, the Supreme Court rejected the wife's claim that the agreement was executed "by mistake 'due to * * * fraud.'" *Id*. at 656.

Similarly, in *Coward and Coward*, 35 Or App 677, 680, 582 P2d 834 (1978), we affirmed the validity of a premarital agreement, finding it significant that the wife not only had an opportunity to consult counsel, but had received advice from the husband's attorney to do so. We also noted that the wife was experienced in business and was fully aware of the intent of the agreement and of the property owned by the husband and its value. *Id*.

Likewise, in *Knoll and Knoll*, 65 Or App 484, 671 P2d 718 (1983), the wife had a wide range of experience in business, including great familiarity with the husband's business. She was told about the need for a premarital agreement at least nine months before the wedding; she knew that its purpose was to preserve the husband's assets for his children and to protect her from his business debts; she was given a copy of the actual agreement at least seven months before the wedding; and she was repeatedly advised to seek independent counsel. Under those circumstances, we held that the husband had not breached his fiduciary duty but,

rather, the wife had had the obligation and the opportunity to protect her own interests. Thus, the agreement was valid. *Id.* at 488-89.

■ In sum, under the case law existing at the time of the enactment of the Act in Oregon, in determining the validity of a premarital agreement, courts primarily considered the sophistication of the party against whom the agreement was being enforced, whether the party had a reasonable opportunity to review the agreement and to seek independent counsel, whether the party was aware of the purpose of the agreement, and, finally, whether the party was aware or should have been aware of the nature and extent of the property that would be affected. [9] *See Baxter*, 139 Or App at 36-37 (applying common law and upholding premarital agreement executed before enactment of the Act). It thus follows that the Oregon legislature, like California's, understood the term "voluntarily" as used in ORS 108.725(1)(a) to imply a lack of coercion, intimidation, or undue pressure, as well as some modicum of knowledge of the terms of the agreement and the property affected. The timing of the agreement in relation to the wedding, an adequate opportunity to consult with independent counsel, the relative sophistication of the parties, and sufficient disclosure of assets are among the factors bearing on that question. [10]

■ Applying those factors in this case, we readily conclude that wife has met her burden of proving that the

---

[9] It bears emphasizing that the assistance of independent counsel for both parties was not a strict prerequisite to enforceability under Oregon common law, but, rather, was a significant factor in the analysis. That, too, is consistent with the UPAA. The official comment to the UPAA states:

"Nothing in Section 6 makes the absence of assistance of independent legal counsel a condition for the unenforceability of a premarital agreement. However, lack of that assistance may well be a factor in determining whether the conditions stated in Section 6 may have existed."

Uniform Premarital Agreement Act, § 6 Comment, 9C ULA 50 (2001). *See also* Tape Recording, Senate Committee on Judiciary, HB 2295, May 24, 1987, Tape 162, Side B (statement of Lawrence Young, explaining that, under the Act, the presence or absence of independent counsel would not raise any "new" concern, but could be important in determining whether there has been "foul play").

[10] That is not to say that some of those factors may not also reasonably pertain to a determination that an agreement is unenforceable under ORS 108.725(1)(b). We need not unravel that question here, however, because we conclude that wife met her burden of proving that she did not enter into the agreement voluntarily.

premarital agreement was not voluntarily entered into. The trial court found, and the evidence demonstrates, that the parties first discussed a premarital agreement a few weeks before their wedding, and then only in general terms. When husband said that he was going to have his attorney arrange it, wife told him to be sure that her attorney was also there. The first time that wife saw the agreement, or, indeed, had any indication of its specific terms, was the day before the parties were scheduled to fly out of town for their wedding. On that day, husband called wife and told her to come to his attorney's office to review and sign the agreement. When wife arrived and was surprised to find that her own attorney was not present as she had requested, husband reassured her that his attorney could take care of it for both of them. When she continued to express reluctance to sign, wife testified that husband "just kept saying, 'The wedding's on. You've told everyone you're getting married. We're leaving tomorrow morning. Go ahead and just sign it. The wedding is on.' " Wife then read and signed the agreement in the presence of husband and his attorney. The entire meeting lasted no more than 30 minutes.

The evidence also demonstrates that wife lacked sufficient knowledge of the extent of the property affected by the agreement. The list of husband's assets that was attached to the agreement was incomplete, and no values were included. The trial court found that wife had limited knowledge of husband's financial holdings. For example, wife testified that she had general knowledge of the existence of husband's pensions, but not of their value; similarly, she was unaware at the time of the agreement of the existence of his certificate of deposit. She also testified that husband took care of all of the couple's financial affairs even before they were married. Moreover, although, as the trial court found, wife had some experience in business matters, that experience was limited and she was relatively unsophisticated in financial matters. We conclude that those circumstances created a sufficiently coercive environment so as to render wife's agreement involuntary. The trial court did not err in refusing to enforce the premarital agreement.

## II. HUSBAND'S SECOND ASSIGNMENT OF ERROR: PROPERTY DISTRIBUTION

■ In his second assignment of error, husband contends that the trial court erred in treating as marital assets the increase in value of his retirement accounts and the appreciation of the Michigan Street property that accrued during the parties' cohabitation.[11] The trial court awarded wife an equal division of the portion of those assets that the parties accumulated during their cohabitation and marriage. It made that award by treating the appreciation of those assets during the parties' relationship, including their cohabitation, as a marital asset to which the presumption of equal contribution applied and, in turn, by finding that the presumption was not rebutted. Husband does not challenge the trial court's award to wife of half the equity that accrued during the marriage itself, that is, between August 12, 1989 and April 2, 2006 (when the parties separated), but argues that the court erred in including in that division the portion accumulated during the approximately three-year period of cohabitation that preceded the marriage.

In husband's view, the remedy is mathematical: With respect to the IBEW and NEBF accounts, the trial court ruled that 64 percent of the value of those accounts was a marital asset to be divided evenly, with wife consequently receiving 32 percent by way of a QDRO. In husband's view, under a correct formulation using the date of marriage rather than the date of cohabitation as the starting date for calculating the marital asset portion of those accounts, wife should instead receive 13.5 percent of the value of those accounts. With respect to the Cascade Fund, wife was awarded a QDRO for "fifty percent (50%) of all deposits, earning, interest and dividends from January 1, 1986 to April 2, 2006"; according to husband, the correct period during which wife is entitled to that share is August 12, 1989 to April 2, 2006. Finally, according to husband's calculations, the interest wife was awarded in the appreciation of the Michigan Street property should be reduced by $12,184, which could be

---

[11] Husband does not contend that the court's distribution of the Garden Lane property is similarly infirm, nor does he challenge any other aspect of the property division.

accomplished by reducing the equalizing judgment that she was awarded.

Wife does not dispute that the court erred in treating assets accrued during the parties' cohabitation as marital assets, but she argues that we should nonetheless affirm the trial court because the same result obtains under the correct "just and proper" analysis in ORS 107.105(1)(f).[12] In wife's view, applying that analysis to the three years of cohabitation that immediately preceded the parties' marriage in this case would result in the same division that the trial court came to—that is, an equal division of the portion of the assets accumulated during that time. That is so, wife argues, because the parties commingled their assets and acted in concert as to their financial plans and dealings throughout the length of their cohabitation and marriage.

■ ■  We agree with the parties that the court erred in treating as marital assets the increase in value of the disputed assets that accrued during the parties' cohabitation. ORS 107.105(1)(f) distinguishes between property brought into the marriage and marital assets; only the subclass of property acquired *during* the marriage is a marital asset to which the rebuttable presumption of equal contribution applies. *Kunze and Kunze*, 337 Or 122, 133, 92 P3d 100 (2004). "If the parties acquired the property at issue before the marriage, then the court considers only what is 'just and proper in all the circumstances' in distributing that property." *Id.* at 134.

In *Timm and Timm*, 200 Or App 621, 628-29, 117 P3d 301 (2005), we explained that that principle applies even

---

[12] ORS 107.105(1)(f) provides, in part:

"Whenever the court renders a judgment of marital * * * dissolution * * *, the court may provide in the judgment:

"* * * * *

"(f)  For the division or other disposition between the parties of the real or personal property, or both, of either or both of the parties as may be just and proper in all the circumstances. * * * There is a rebuttable presumption that both spouses have contributed equally to the acquisition of property during the marriage, whether such property is jointly or separately held."

The 2007 Legislative Assembly made technical changes to the statute, *see* Or Laws 2007, ch 71, § 27. Those amendments do not affect our analysis in this case; thus, we cite the current version of the statute in this opinion.

if the asset was acquired during the parties' cohabitation. The circumstances in *Timm* are similar to those in this case. In *Timm*, the parties cohabitated for four years in "more than a casual, expense sharing relationship" before they were married. *Id.* at 623 (internal quotation marks omitted). During that period, both parties earned retirement benefits from their employment; husband also acquired a rental property from his parents. We determined that the trial court erred in treating the equity in that property and the amounts accruing in the parties' retirement accounts during the cohabitation as marital assets:

> "[A]ccording to *Kunze*, the only relevant inquiry is when an asset was acquired: if it was acquired during the marriage, it is a marital asset, if it was acquired before the marriage, it is not, regardless of the nature of the parties' premarital relationship."

*Timm*, 200 Or App at 628-29.

■ That does not end our inquiry, however, because we still must decide if it is just and proper to award wife an interest in the property that was acquired during the parties' cohabitation. In *Kunze*, the court explained that, although the commingling of finances cannot transform an asset acquired before the marriage into a "marital asset," there are two circumstances where commingling may affect the proper division of the separately acquired assets. *Kunze*, 337 Or at 137-42. The first is when a separate asset has been so commingled with the joint assets of the marriage that the court is precluded from identifying the source of the disputed asset "with sufficient reliability to rebut the statutory presumption that both spouses have contributed equally to the disputed asset." *Id.* at 138. That "tracing" problem is not an issue with respect to the disputed assets in the present case, and we do not understand wife to be arguing otherwise.

■ ■ The second instance occurs when a spouse has so integrated a separately acquired asset into the joint finances of the marital partnership that it would be inequitable to award the asset to that spouse as separate property under a "just and proper" distribution of the parties' marital property. *Id.* at 142; ORS 107.105(1)(f). In making that determination, we focus on whether the spouse "demonstrated an

intent to retain that spouse's separately acquired asset as separate property or whether, instead, that spouse intended for that property to become the joint property of the marital estate." *Kunze*, 337 Or at 142. That is so because, "when a spouse has treated a separately acquired asset as a joint asset of the marital partnership, then the parties' shared financial decisions during the marriage have been made in reliance of that asset without consideration to whether it was separately or jointly acquired." *Id.* at 140; *Lind and Lind*, 207 Or App 56, 67, 139 P3d 1032 (2006) ("Intent * * * depends not on what a spouse might privately contemplate or even publicly declare; it depends on how a spouse *acts*, that is, on what the spouse's 'treatment' of the asset 'demonstrate[s].' " (Emphasis and brackets in original.)). Factors relevant to the determination of intent include: "(1) whether the disputed property was jointly or separately held; (2) whether the parties shared control over the disputed property; and (3) the degree of reliance on the disputed property as a joint asset." *Kunze*, 337 Or at 141-42.

In the present case, as husband points out, the retirement accounts were always held in his name and the Michigan Street property was used principally by husband's mother and, after her death, as a rental. In his view, those assets were never commingled. Wife, on the other hand, argues that the parties' entire financial relationship was "symbiotic," dating from their cohabitation and continuing throughout the marriage.

The record supports wife's view. The evidence demonstrates that, throughout the parties' domestic relationship and marriage, the couple's financial dealings were generally intertwined. Husband was the primary source of the family's income, while wife took care of the home, meals, laundry, paying bills, cleaning, and transporting husband's children back and forth to their home for parenting time. Wife also went with husband when he worked out of town for extended periods; for example, they once lived in another town for nine months and someone else ran wife's business. Wife testified that, although that business "always struggled," her income from it was spent on food, clothes, household items, "whatever we needed." The couple also saved wife's income for

weekend trips and yearly vacations, and her finances contributed to the "family pot" both during the cohabitation and after they were married. The parties held a joint checking account that was used for household bills. Husband deposited his paychecks into this account, wife also "occasionally" deposited money into this account.[13]

Turning to the disputed assets in particular, the Michigan Street property was acquired by husband in the dissolution of his prior marriage, subject to a lien and mortgage, and was titled in his name. Husband's mother lived in it until 1995, paying $800 per month, which covered the mortgage, taxes, and insurance. After she died, the property continued to be rental property. Both parties contributed to maintaining the property as a rental; for example, wife did inside repairs, cleaned, and painted between renters. In addition, rental payments from the property were deposited into an account that was held in both parties' names, and wife wrote checks for repair and cleaning services to the property out of that account. The lien and mortgage on the house were paid off during the marriage, with money from husband's income.

With respect to the retirement accounts, although they were held in husband's name, contributions to those accounts came from husband's employment income, a marital asset. Moreover, wife testified that the parties had talked often about retirement and that, at family events, husband "always talked about the retirements and said that we'd be well provided for. That I never had anything to worry about."

Under those circumstances, we conclude that husband demonstrated an intention to integrate those separately acquired properties into the parties' joint finances; accordingly, under a "just and proper" division of the parties' property, wife is entitled to an equal division of the portion of those properties that accrued during the parties' cohabitation

---

[13] Wife maintained a separate business account for her hair salon business, which was converted to a personal account when the business was sold. Money from her business and her child support payments were deposited in that account. Husband also maintained a separate checking account.

and marriage. Thus, although the trial court erred in determining that the portions accumulated during the cohabitation were marital assets, a "just and proper" division of the parties' property yields the same result. Accordingly, we affirm the trial court's property division.

## III.  WIFE'S CROSS-APPEAL:
## SPOUSAL SUPPORT

The trial court awarded wife spousal support of $1,000 per month for 60 months. In her cross-appeal, wife assigns error to that ruling, arguing that the trial court erred in failing to award her indefinite spousal support. According to wife, the factors set out in ORS 107.105(1)(d)(C) support such an award.[14] In particular, wife emphasizes the lengthy duration of the parties' cohabitation and marriage; wife's poor health; the standard of living established during the marriage; the disparity in wife's earning capacity compared with husband's; her limited education, employment skills, and work experience; and the disparity in the financial needs and resources of the parties.

Husband responds that the facts do not support an award of indefinite spousal support, noting, in addition to his

---

[14] Under ORS 107.105(1)(d)(C), the court may order:

"Spousal maintenance as a contribution by one spouse to the support of the other for either a specified or an indefinite period. The factors to be considered by the court in awarding spousal maintenance include but are not limited to:

"(i)  The duration of the marriage;

"(ii)  The age of the parties;

"(iii)  The health of the parties, including their physical, mental and emotional condition;

"(iv)  The standard of living established during the marriage;

"(v)  The relative income and earning capacity of the parties, recognizing that the wage earner's continuing income may be a basis for support distinct from the income that the supported spouse may receive from the distribution of marital property;

"(vi)  A party's training and employment skills;

"(vii)  A party's work experience;

"(viii)  The financial needs and resources of each party;

"(ix)  The tax consequences to each party;

"(x)  A party's custodial and child support responsibilities; and

"(xi)  Any other factors the court deems just and equitable."

own age (55), that wife is a licensed cosmetologist and has run her own salon, that she did not produce any medical testimony as to her migraines, that she received substantial assets in the property distribution, and that she did nothing to help advance husband's employment during the marriage.[15]

The trial ruled in its letter opinion:

"The court does not believe that wife is incapable of returning to work at some time. The migraines began in March 1999. Wife continued to work in her business as a cosmetologist even after that date until she sold her business in 2001. Thereafter she continued to work part time as a beautician until sometime around 2004. Wife testified that she can work when she does not have headaches. She also testified that she has no physical limitations, that she can stand and move her arms and shoulders, that she is able to go on walks, swim and engage in other activities.

"The court does not believe that wife is physically unable to work. She has work skills and a background operating her own business where she could control her work schedule. The court is satisfied that given time wife will be able to find employment based on her training and experience.

"There is however a need for [maintenance] spousal support as wife establishes herself apart from husband following the nineteen year relationship. The court will therefore award [maintenance] support to wife of $1000 per month for a total of five years. This is the amount proposed by husband at trial."

The trial court's findings as to the effect of wife's migraines on her ability to work are supported by evidence in the record, and we accept them. We also agree with the court's conclusion that wife is not incapable of returning to some level of employment. She is a licensed cosmetologist and, as the trial court noted, has been able to work part time in the past, even with her health concerns. Nonetheless, for the reasons articulated below, we agree with wife that an award of indefinite support is warranted under the circumstances.

---

[15] Husband also argues that the premarital agreement prevents any award of spousal support. That argument is precluded by our disposition of husband's first assignment of error.

The parties were married for almost 17 years and cohabitated for approximately three years before that. Husband is an electrician for the Bay Area Hospital and has been since 1991. At time of dissolution, he was earning approximately $5,600 per month. In addition, in the property division, he was awarded the Michigan Street property, which generates $800 per month in rental income.

Wife, on the other hand, functioned primarily as a "homemaker" over the course of the cohabitation and marriage. She took care of the home, groceries, laundry, cleaning, preparing meals, and transporting the children. Although she owned a two-chair hair salon for some years during the marriage, it was always a struggling business. In addition, because husband wanted her with him when his job took him out of town, she was often absent from the business for extended periods. The most income she reported over the course of the parties' relationship was in 1992, when she reported a gross annual income for tax purposes of $4,989. The last year that she reported any income for tax purposes was 2000, when she reported $1,351. In 2002, she reported gross income of $2,150 and actual losses of $7,226. At the time of trial, wife had no income and was living with relatives in California. Her expenses included over $300 per month in medications to treat her migraines.

In short, there is no evidence in the record to indicate that wife's earning capacity—if and when she does find employment—will be anything more than minimum wage. Moreover, it is unlikely that wife will ever be able to work more than part time, given her health problems. Given all of those circumstances, we conclude that it is "just and equitable" to award wife indefinite spousal support of $1,000 per month. ORS 107.105(1)(d). Moreover, because wife will need to reestablish herself as a cosmetologist in California, or find some other unknown source of employment, after being absent from the job market for some time, we conclude that an award of $1,500 per month is appropriate for the first 60 months.

Affirmed on appeal; on cross-appeal, judgment modified to award wife maintenance spousal support of $1,500 per month for 60 months and $1,000 per month indefinitely thereafter.